**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

United States of America,       :        CIVIL ACTION
                                :
                                :        04-cv-4500
                                :        98-cr-450-2
              v.                :
                                :
                                :
David Chorin                    :

**MEMORANDUM AND ORDER**

**Joyner, J.**                                    **February 14, 2008**


        Presently before the Court is David Chorin's ("Chorin")
Motion for _Habeas Corpus_ pursuant to 28 U.S.C. § 2255 ("Section
2255").


## I. Background


        On November 17, 1999, David Chorin was charged, by way of
a second superseding indictment, with attempt to manufacture more
than one kilogram of methamphetamine in violation of 21 U.S.C. §
841 (Count One) and possession of monomethylamine, knowing or
having reasonable cause to believe that it would be used to
manufacture methamphetamine in violation of 21 U.S.C. § 841(d)(2)
(Count Three).[1]  Kevin Caden, Chorin's co-defendant, was charged
with the same and additionally charged with possession of 40
grams or more of phenyl-2-propanone ("P2P") in violation of 21
U.S.C. § 841(a)(1) (Count Two).

_____

        [1]Prior to the filing of the second superseding indictment,
Chorin had been charged only with Count Three.

Trial commenced on December 1, 1999.  Chorin was represented by Louis R. Busico, Esquire.  Prior to retaining Mr. Busico, Chorin was represented by two other attorneys, Carol Carson, Esquire and Gerald Ingram, Esquire.  Ms. Carson was appointed by the Court to represent Chorin shortly after his arrest in October 1998.  However, due to medical reasons, she withdrew from the case in July 1999.  In August 1999, the Court appointed Mr. Ingram.  Because of difficulties that Chorin encountered with Mr. Ingram, he sought substitute counsel, retaining Busico to represent him at trial.  Busico entered his appearance with the Court on October 7, 1999.

At trial, agents of the Drug Enforcement Administration ("DEA") testified that they executed a search warrant at 258 East Hortter Street in Philadelphia on August 12, 1998.  Kevin Caden, the tenant of record, was present during the DEA search.  Agents seized several items, including a gas cylinder containing methylamine gas, a precursor to methamphetamine.  They additionally seized methylamine in liquid form, P2P, aluminum foil, cooking pots, ethanol, cutting agents, distilled water, a pH meter, mercuric chloride, baby bottle liners and a recipe describing how to manufacture methamphetamine.

DEA agents further testified that in mid-October 1998, they searched a garage at 5803 Woodland Avenue in Philadelphia. During the search, they encountered David Chorin.  While there,

2

the agents seized a tank of methylamine gas, dry ice, mercuric chloride, and an Ohaus scale.  At trial, a chemist with the DEA, Charles Cusumano, testified that these items, with the exception of mercuric chloride, are used to convert methylamine gas into methylamine liquid, which is then used to manufacture methamphetamine.

Based upon the serial numbers found on the gas cylinders recovered at both locations, DEA agents searched Scully Welding and Supply.  The search at Scully revealed that the cylinders were sold to an individual named "Thomas Kimble", a known alias of Kevin Caden's, and the same name that he used to rent the Hortter Street property.

At trial, Manfred DeRewal and Edmond Gifford, two inmates who engaged in conversations with Chorin while incarcerated, also testified.  DeRewal testified that, while he and Chorin were incarcerated at Passaic County Jail, Chorin told him that he had converted methylamine gas into methylamine liquid and that he had also manufactured methamphetamine.  Gifford testified that, while he and Chorin were incarcerated at a Philadelphia County Prison, Chorin told him that he and "a partner" rented cylinders from Scully to manufacture methylamine liquid.  Gifford further testified that Chorin told him that he had sold ten gallons of methylamine liquid the night before his arrest for $30,000 and that he had previously manufactured methamphetamine with an

3

associate.

Charles Cusumano, the DEA expert, testified that, based upon the amount of methylamine found at the two locations, the laboratories were capable of producing about 73.2 kilograms of pure methamphetamine.

On December 3, 1999, the jury convicted Chorin on all counts. After trial, Chorin petitioned this Court for substitute counsel.  In April 2000, Chorin retained Anthony F. List, Esquire to represent him in post-trial proceedings and at sentencing. However, due to a conflict with another case, Mr. List withdrew his representation of Chorin and was subsequently replaced by Arthur R. Shuman, Esquire in April 2001.  Shuman represented Chorin at sentencing and throughout his direct appeal.

At sentencing, on September 13, 2001, this Court credited the DEA expert's estimate of the drug quantity and sentenced Chorin to 324 months imprisonment, five years of supervised release, ordered restitution in the amount of $5,000 and imposed a special assessment of $200.

The Third Circuit affirmed the conviction and sentence. See United States v. Chorin, 322 F.3d 274 (3d Cir. 2003)(Roth, J.).  On June 9, 2004, Chorin filed the instant Motion pursuant to 28 U.S.C. § 2255 alleging that he received ineffective assistance of counsel at all stages throughout his case.  First,

he alleges a myriad of deficiencies by trial counsel, Louis R. Busico, that ultimately prejudiced the outcome of his trial. Chorin also alleges ineffectiveness on the part of Arthur Shuman, who represented him at sentencing and on direct appeal.

           A § 2255 hearing was held before this Court on March 18, 2005 and June 16, 2005.  The Court heard testimony from Chorin as well as from Attorneys Busico, Shuman and Carson.

## II. Standard of Review

          Section 2255 permits a prisoner in federal custody to challenge the validity of his sentence.  28 U.S.C. § 2255.; see also United States v. Eakman, 378 F.3d 294, 297 (3d Cir. 2004). A petition submitted under Section 2255 may be filed at any time within one year from: (1) the date on which the conviction became final; (2) the date on which the impediment to making a motion created by the government action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; and (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.  Id. § 2255.

5

## III. DISCUSSION

### A.   Ineffective Assistance of Counsel

The Sixth Amendment guarantees criminal defendants the right to "reasonably effective" legal assistance. Strickland v. Washington, 466 U.S. 668, 687 (1984).  An attorney's performance is ineffective if a habeas petitioner demonstrates: (1) that "counsel's representation fell below an objective standard of reasonableness"; and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688, 694.  Courts conventionally describe the two prongs of the Strickland test as the "performance prong" and the "prejudice prong."

The "performance prong" requires a court to assess whether counsel's representation was constitutionally deficient. The Sixth Amendment, however, does not guarantee that a defendant receives either perfect representation or that his attorney's performance is error-free.  And consistent with this understanding of the Sixth Amendment is the presumption "that counsel [was] effective" at trial.  United States v. Farr, 297 F.3d 651, 658 (7th Cir. 2002).[2]  Thus, judicial scrutiny of

---

[2] The Strickland test for ineffective assistance of counsel applies with equal force to analysis of the performance of appellate counsel.  United States v. Mannino, 212 F. 3d 835, 840 n.4 (3d Cir. 2000) citing, Diggs v. Owens, 833 F.2d 439, 444-5 (3d Cir. 1987).

whether an attorney's performance did in fact fall "below an objective standard of reasonableness" is not exacting. Strickland, 466 U.S. at 688; see also Affinito v. Hendricks, 366 F.3d 252, 258 (3d Cir. 2004).  In this regard, Strickland observed:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight*, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Strickland, 466 U.S. at 689 (emphasis added).  That an attorney's performance was effective therefore begins with the "strong presumption that counsel's conduct falls within the *wide range* of reasonable professional assistance." Id. (emphasis added).

If a petitioner establishes that his attorney's performance was constitutionally deficient, the court then turns to Strickland's "prejudice prong."[3]  The "prejudice prong" focuses exclusively on whether the outcome of the trial (or

_____

[3] When an attorney's performance is judged to be reasonably effective within the meaning of the Sixth Amendment, a petitioner can not argue, as a matter of law, that the attorney's performance prejudiced the outcome of his trial (or the proceeding).

proceeding) would have been different but for the attorney's errors.  The standard for showing prejudice "is not a stringent one." Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (quoting Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)).  A petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; Lockhart v. Fretwell, 506 U.S. 364, 372 ("[T]he "prejudice" component... focuses on the question [of] whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.") (citations omitted).  And though this standard demands that a petitioner show more than "that the errors had some conceivable effect on the outcome of the proceeding," it does not require a showing that the error "more likely than not altered the outcome in the case." Strickland, 466 U.S. at 693; see also Hull, 190 F.3d at 110 (prejudice standard "is less demanding than the preponderance [of the evidence] standard").

**Trial Counsel**

Chorin alleges that his trial counsel, Louis R. Busico, was constitutionally ineffective for a myriad of reasons, including: 1) failing to adequately consult with Chorin about the government's filing of a second superseding indictment, his

overall trial strategy, the retention of a defense expert or the
filing of pre-trial and post-trial motions; 2) failing to conduct
any investigation and/or subpoena any witnesses in preparation
for trial; 3) failing to voir dire and adequately cross-examine
the government's expert witnesses; 4) failing to object to a jury
instruction which was tainted by an improper comment made by the
trial court; 5) failing to contact Chrorin's previous attorney
about her preparation and defense strategy; and 6) failing to
seek a continuance to defend against Count One of the superseding
indictment to which Chorin was added two weeks before trial.

**Failure to Consult with Client on Various Issues**

        Chorin first alleges that his trial attorney was deficient
for failing to consult with him about several important trial
issues, including: 1) the government's filing of a second
superseding indictment; 2) his overall trial strategy; 3) the
retention of a defense expert; and 4) the filing of pre-trial and
post-trial motions.  To support his claim that his attorney
failed to consult with him about these matters, Chorin points to
the limited amount of one-on-one time that he spent with Busico
preparing for trial.

        Chorin states that he met with him only twice prior to
his trial - once during a visit at F.C.I. Schuykill where Chorin
was being held and again just before trial at the federal

9

courthouse, both visits totaling no more than 45 minutes.  (Doc.
No. 183 at 18).  Chorin further alleges that despite his repeated
insistence that he was innocent, Busico's "sole strategy" was to
encourage his cooperation with the government.  Id.

     Despite these allegations, Busico testified at the § 2255
hearing that he spent approximately two hours with Chorin during
his visit to F.C.I. Schuykill discussing the strengths and
weaknesses of the case, Chorin's understanding of Federal
Sentencing Guidelines *and* the fact that cooperating with the
government was a viable option.  (N.T. 3/18/05 at 10,13).  Busico
further testified that prior to the visit at F.C.I. Schuykill, he
spent several hours reviewing a significant amount of discovery
in the case.  Id.  He also engaged in substantive discussions
with the prosecuting attorney and with Kevin Caden's attorney.
Id.

     While Chorin may have preferred to have spent more time
discussing his trial strategy with his attorney, he has not
demonstrated that Busico failed to consult with him about his
case or that he was insufficiently prepared for trial as a
result.  Citing Government of Virgin Islands v. Weatherwax, 77
F.3d 1425 (3d Cir. 1996), Chorin argues that Busico's failure to
adequately consult with him deprived him of an opportunity to
assist in his own defense.  The Court in Weatherwax reviewed
whether an attorney's failure to consult with his client

regarding whether to move for a mistrial upon learning of juror misconduct, an issue over which counsel had final word, constituted ineffective assistance of counsel.  Id. at 1436.  In evaluating the claim, the Court identified the purpose of consulting with one's client on those types of issues:

> The requirement that counsel consult with his or her client concerning issues on which counsel has the final word serves a number of important purposes.  First, it assures that the client will have the opportunity to assist with his own defense...Second, the client's views and desires concerning the best course to be followed are relevant considerations that must be evaluated and taken into account by counsel.  Without consultation, the views and desires of the client may not be known to counsel.  Third, consultation serves to promote and maintain a cooperative client-counsel relationship.

Id.

The record reflects that Busico did consult with Chorin about the merits of his case before ultimately deciding upon his defense theories.  At the 2255 hearing, Busico stated that he was made well-aware at their initial meeting at F.C.I. Schuykill, that Chorin did not wish to cooperate with the government.  (N.T. 3/18/05 at 13).  Chorin admits that he discussed potential witnesses with Busico during that meeting – also demonstrating that they discussed more than Chorin's potential cooperation with the government. (Doc. 183 at 20).  While we cannot be certain of the precise nature of their discussion, Chorin has not

demonstrated that Busico failed to provide him with the
opportunity to present his personal view of the case at that
meeting.  As evinced by his performance at trial, Busico employed
defense theories demonstrating a knowledge of the facts and
circumstances of Chorin's case.  Chorin has not alleged that he
further attempted to contact Busico to discuss the case after
that meeting and that Busico failed to respond.

Certainly, circumstances changed after that meeting, when,
on November 17, 1999, Chorin was additionally charged with Count
One (attempt to manufacture) by way of a second superseding
indictment.  Chorin claims that he was made aware "almost in
passing" of the filing of that indictment. (Doc. 183 at 18).
Chorin admits, however, that Busico had a discussion with him on
November 29, 1999 while in his holding cell in Philadelphia,
after the filing of the indictment.  (Doc. 190 at 3).  Chorin
then signed a consent to proceed to trial on November 30, 1999
agreeing to proceed to trial on the superseding indictment.
(Doc. 79).  Obviously, Chorin was informed about the additional
charge against him and given the opportunity to discuss it with
his attorney.  While a discussion held in a holding cell may have
been less than ideal, a consultation occurred nonetheless.  Had
Chorin not wished to proceed to trial on the superseding
indictment, he had the opportunity to withhold consent.

The Sixth Amendment does not guarantee that there will

must be a "meaningful relationship" between an accused and his counsel.  <u>Morris v. Slappy</u>, 461 U.S. 1, 13 (1983).  Instead, a defendant must show that his attorney's performance was deficient.  That requires a showing that "counsel made an error so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  <u>Strickland</u>, 466 U.S. 668, 687  (1984).  Chorin has not demonstrated that he was deprived of adequate consultation with his attorney in preparation for trial.

Chorin has also failed to demonstrate that his attorney was deficient for failing to discuss with him and/or hire a defense expert.  As Busico explained at the 2255 hearing, and as evinced in his cross-examination on the government's expert witness, he pursued a legitimate strategy in not retaining a defense expert.

Busico, in his cross-examination of Mr. Cusumano, attempted to distance Chorin from the items seized at the Woodland Avenue location.  He questioned Mr. Cusumano as to his ability to determine the ultimate user of the items seized during the DEA search, a conclusion that Mr. Cusumano conceded he was incapable of determining:

> Q: So you would need both physical items
>    and somebody who knows how to put
>    [methamphetamine] together to make the
>    end result, right?
> A: Yes, you would.

13

```
Q: But that is where your opinion stops.
   In other words, you can't give this jury
   an opinion as to who, in terms of a person,
   was putting these things together to produce
   methamphetamine, can you?
A: No.
```

As further evidence that his attorney was deficient for failing to retain an expert at trial, Chorin has submitted to the Court an affidavit prepared by Gene Geitzen, a forensic scientist who has provided expert analysis in other federal and state cases involving clandestine methamphetamine laboratories.  Mr. Getizen's affidavit, which only addresses the Woodland Avenue location, states that in light of the fact that P2P and "other required solvents/chemicals and glassware" were not found at that location "the synthesis of [m]ethamphetamine could not be completed".  (Exh. 14 at 3).  For purposes of the charge stemming from the Woodland Avenue search (possession of methylamine) it is not significant that P2P was not found there.  Methylamine is a listed chemical with virtually no legitimate private use.  It is costly and difficult to obtain.  That, combined with the fact that he was found sleeping there when the search commenced was obviously significant evidence supporting the government's case.

Had Mr. Geitzen testified at trial to the points made in his affidavit about that location, it is unlikely that it would have had significant impact.  As mentioned, Chorin was not charged with attempt to manufacture at the Woodland Avenue

14

location, only that he possessed methylamine.  Accordingly, Mr.
Geitzen's affidavit does not offer persuasive evidence that
Chorin's attorney was deficient for failing to secure an expert
to address those points.

    With regard to the Hortter Street location, Chorin was
charged with offenses stemming from the search of that location
despite the fact that only Mr. Caden was present during the DEA
search.  Chorin and Caden were charged with attempting to
manufacture more than one kilogram of methamphetamine based upon
the total quantity of the materials seized.  When agents searched
the Hortter Street location, they recovered numerous drug
manufacturing instruments, drug paraphernalia, methamphetamine
and other chemicals (including a 125 gallon monomethylamine gas
cylinder containing approximately 70 lbs. of monomethylamine gas
and P2P).

    While P2P is a controlled substance and precursor for
methamphetamine, the fact that a substantial quantity of P2P was
not recovered during the search did not preclude the government's
expert from calculating the potential yield of pure
methamphetamine based on the amount of methylamine that was
recovered.  As the Third Circuit discussed in its opinion
addressing an argument made by Kevin Caden on direct appeal -
that the calculation of the drug quantity was erroneous - the
Court affirmed that "a District court may estimate the amount of

15

controlled substance that a defendant could manufacture from the precursor he possessed if he combined that with the proportionate amount of missing ingredients." Chorin, 322 F.3d at 280 (citing United States v. Smith, 240 F.3d 927, 931 (11th Cir. 2001); United States v. Becker, 230 F.3d 1224, 1234-5 (10th Cir. 2000); United States v. Smallwood, 920 F.2d 1231, 1238 (5th Cir. 1991)).

Because challenging the inadequate amount of P2P would not have been useful to defend the charge, Busico pursued an alternative defense - that the government also had insufficient evidence tying Chorin to the Hortter Street location.  While cross-examining Agent Woodcock, Busico asked him about the physical evidence that the DEA had uncovered linking Chorin to the premises.  Significantly, Agent Woodcock admitted that the DEA possessed no surveillance or photographic evidence placing Chorin at that site nor did they find any papers showing that Chorin had ever occupied or leased the premises.  (N.T. 12/1/99 at 113 -120).

To further support his argument that Busico should have hired a defense expert, Chorin points to the fact that his previous attorney, Carol Carson, had been granted an Order by this Court authorizing the use of C.J.A. funds to hire an expert.[4]

_____

[4]Chorin additionally alleges that Busico rendered ineffective assistance of counsel by failing to contact Ms. Carson to discuss the case or serve subpoenas that she drafted prior to ending her representation.  The fact that Busico relied

As a threshold matter, during the period that Ms. Carson

represented Chorin, he was only charged with Count Three of the

indictment (possession).  The motion that Ms. Carson submitted to

the Court requesting funds to retain an expert states, in

---

upon his own preparation for trial, without contacting Ms.
Carson, is not sufficient to demonstrate that he was unprepared
for trial. As already discussed herein, Busico testified that he
independently reviewed the record and prepared his defense.
     The subpoenas at issue were prepared by Ms. Carson in order
to obtain Chorin's jail records and the Woodland Avenue utility
bills.  Chorin argues that the jail records would have
demonstrated that he was incarcerated for significant periods of
time during which Count One (attempt to manufacture) occurred.
The utility bills, according to Chorin, would have shown that
there were no bills in his name at the Woodland Avenue location,
but that they were instead registered to "Steven King".  Although
it is unclear why Busico did not serve these subpoenas, as he was
not asked about them at the 2255 hearing, Busico did present the
underlying arguments at trial during his cross-examination of
Agent Woodcock.  (N.T. 12/1/99 at 127-30). Busico asked Agent
Woodcock about a bank statement that the DEA seized during the
Woodland Avenue search.  The bank statement, belonging to Chorin,
listed his address as a home outside of Philadelphia, reinforcing
Chorin's contention that he was merely sleeping at the location
when it was raided.  Busico followed up with Agent Woodcock
asking him whether he had ever visited the address found on
Chorin's bank statement.  Agent Woodcock admitted that he had
not, further suggesting that the government had not adequately
investigated whether Chorin was in fact merely sleeping at the
property and not otherwise associated with it.  Additionally,
Busico asked Agent Woodcock whether he knew of Chorin's
whereabouts in the days prior to the Hortter Street search, to
which Agent Woodcock admitted that he did not.
     While the documents requested in the subpoenas prepared by
Ms. Carson may have bolstered those arguments, the arguments were
nonetheless introduced via Agent Woodcock.  It is arguable,
however, that the jail records, had they been introduced, would
have been more prejudicial than helpful to Chorin.  Given the
wide range of discretion permitted under Strickland, we do not
find that Busico was deficient for failing to make the arguments
in the precise manner contemplated by Chorin's previous attorney.
See Strickland, 466 U.S. at 689.

17

relevant part:

> The defense will consist primarily upon an
> attack on the sufficiency of evidence and the
> rather tenuous connection between this
> defendant and the substance that was found on
> the premises.  In order to corroborate Mr.
> Chorin's theory of defense it is necessary
> that the defense be afforded the opportunity
> to present the expert testimony of Mr.
> Michael Perrone (A copy of Mr. Perrone's
> resume is attached as Exhibit A).  *In
> essence, Mr. Perrone will testify that, in
> his opinion as an expert in the area of
> narcotics investigation, that the property in
> which the tank was located could not have
> possibly been used for a "meth lab" and all
> the chemicals are paraphernalia necessary to
> process methamphetamine."*  He will further
> testify as to the possible legitimate purpose
> for P2P.  The testimony is critical to the
> defense in that it will corroborate Mr.
> Chorin's claim that no drugs were being
> manufactured on the premises.

(Doc. 33) (emphasis added).

As previously noted, the charge stemming from the Woodland Avenue location was not that Chorin was operating a methamphetamine lab or that he was in fact manufacturing methamphetamine, but that he possessed methylamine.  Because Ms. Carson's motion states that the intended purpose of an expert was to disprove that a "meth lab" operated at this location, the Court fails to see how such an expert would have been relevant to defending the charge.  More importantly, we fail to see how Busico's representation at trial can be deemed ineffective for not following through with Ms. Carson's intended expert, when,

18

for the reasons which we have stated, the testimony that she
intended to illicit from an expert would not have been
particularly helpful to the case.

Ms. Carson did, however, state an additional defense
theory in her Motion - to attack the "tenuous connection between
[Chorin] and the substance that was found on the premises".[5]
Busico offered this defense at trial through his cross-
examinations of Mr. Cusumano and Agent Woodcock about the lack
of physical evidence tying his client to the location, despite
the fact that Chorin was found sleeping there when the search
commenced.

Because Chorin has failed to adequately demonstrate that
his attorney's performance was unreasonable with regard to this
claim, he has failed to carry his burden of overcoming the

_____

[5]Chorin further argues that Busico failed to adequately voir
dire the government's experts, particularly Charles Cusumano,
about his qualifications.  Chorin states that Cusumano should
have been questioned about his "vacuum search method" a subject
on which he had previously written.  Essentially, that method
allows one to determine if a location has been used to
manufacture methamphetamine by analyzing porous objects found at
the site.  Chorin asserts that had Cusumano been asked about this
method, a defense expert could have "used Cusumano's own
extraction technique to demonstrate the fact that methamphetamine
had never been produced at either location."  The Court fails to
find this argument compelling as Chorin was not charged with
manufacturing methamphetamine at either location.  Cross-
examining Cusumano about the use and/or results of the vacuum
method would not have been particularly helpful in light of the
fact that Chorin was charged only with attempt and possession.
Chorin does not otherwise challenge Cusumano's credentials in the
instant motion.

presumption of constitutionally acceptable performance.[6]

**Failure to Conduct an Adequate an Investigation and Subpoena
Witnesses**

Chorin also alleges that Busico failed to adequately

investigate and/or subpoena certain witnesses in preparation for

---

[6]Chorin also claims that Busico was ineffective because he failed to request a continuance after a second superseding indictment was filed shortly before trial commenced, additionally charging Chorin with attempt to manufacture methamphetamine (Count One).  Chorin argues that Busico was unprepared to defend the additional charge, which stemmed from the Hortter Sreet location.  When asked why he did not seek a continuance at the 2255 hearing, Busico stated that while he had considered it, he ultimately determined that he was able to adequately defend the charge.  (N.T. 3/18/05).  Chorin has not provided specific examples in the record where Busico's representation fell short in defending the charge.  The primary evidence offered by the government connecting Chorin with the Hortter Street location was the testimony of Gifford and DeRewal, who were previously incarcerated with Chorin.  They testified that Chorin told them that he had previously manufactured methamphetamine at that location.  In addition, the owner of the property, Ira Zinner, testified that Chorin had accompanied Caden when he leased the property.  As will be discussed later in further detail, Busico employed a reasonable strategy to impeach the testimony of the government witnesses.  He also, via Agent Woodcock, established that there was no photographic evidence or paperwork linking Chorin to the location nor had the DEA conducted any fingerprint analysis on the items seized that might have identified who had used the items. (N.T. 12/1/99 at 115-18).  Lastly, in his cross-examination of Mr. Zinner, Busico clarified that Kevin Caden was the sole lessee of the premises. (N.T. 12/1/99 at 50).  The facts of the case did not change once Chorin was added to the additional count and Busico had nearly two weeks to prepare once the superceding indictment was filed.  Chorin has not demonstrated that Busico was unprepared to represent him at trial or that the outcome would have been different had Busico requested a continuance.  Accordingly, Chorin has failed to satisfy either prong under <u>Strickland</u> and, as a result, we find that this claim for ineffective assistance of counsel lacks merit.

trial, including: 1) Larry Henry, an associate of co-defendant
Caden's; 2) Robert Engasser and Frank DeSumma, cell mates of
cooperating government witnesses Gifford and DeRewal; and 3)
Patty Mallon, an acquaintance of Chorin's at the time of his
arrest.

Under <u>Strickland</u>, trial counsel is only required to make
"reasonable investigations or to make a reasonable decision that
makes particular investigations unnecessary."  <u>Strickland</u>, 466
U.S. at 691.  After reviewing the record, the Court finds that
Busico's decision not to subpoena these individuals was
reasonable.

**Larry Henry**

Chorin alleges that had his attorney investigated Larry
Henry, it is "reasonably likely" that the outcome of his trial
would have been different because evidence existed which "proved
that Larry Henry was the party who actually rented the tanks of
methylamine from Scully Welding." (Doc.183 at 33).  As support,
Chorin cites several important documents which include Mr.
Henry's name, including an invoice from Scully and notes from
Agent Woodcock during his investigation stating that Caden
procured the tanks from Scully with "help from Larry Henry."
(Doc. 183, Exh. 8-10).

"[A]n attorney must investigate a case, when he has cause

to do so, in order to provide minimally competent professional representation." <u>U.S. v. Kauffman</u>, 109 F.3d 186, 190 (3d Cir. 1997).  When assessing an ineffective assistance of counsel claim for a failure to investigate, a court must assess the decision not to investigate "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 691; see also <u>Duncan v. Morton</u>, 256 F.3d 198, 201 (3d Cir. 2001).  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Strickland</u>, 466 U.S. at 691-92. Even if counsel is deficient in the decision not to conduct an investigation, a petitioner must show a reasonable likelihood that, but for the deficiency, the result of the proceeding would have been different. <u>Lewis v. Mazurikiewicz</u>, 915 F.2d 106, 115 (3d Cir. 1990).

While Chorin argues that his attorney failed to investigate the existence of Mr. Henry, it is clear from the trial record that Busico was aware of Mr. Henry and that his name appeared on several documents suggesting his involvement in purchasing the tanks from Scully.  Busico appropriately highlighted this fact during his cross-examination of Agent Woodcock.  Agent Woodcock was asked if he was aware that Mr. Henry's name appeared on an invoice for the purchase of the tanks

from Scully. (N.T. 12/1/99 at 105-7).  Asking Agent Woodcock that question permitted the jury to learn about the possibility that other persons may have been involved and that the government may not have fully investigated the case.

Petitioner encourages the Court to speculate that if a more intensive investigation had been conducted on Mr. Henry, it would have been "reasonably likely" that the outcome of Chorin's trial would have been different.  The court finds that assertion highly speculative.  Even if we were to determine that counsel should have investigated Mr. Henry further, Chorin has not demonstrated that he was prejudiced by such failure.  Unlike co-defendant Caden, the government never alleged that Chorin purchased the tanks from Scully. However, through other evidence, particularly the testimony of cooperating witness Gifford, the government successfully demonstrated that Chorin was significantly connected to the tanks after their purchase.  The government also elicited the testimony of the owner of the Hortter Street property who told the jury about Chorin's repeated in-person payments of monthly rent and that he accompanied Caden when the property was initially leased.  Because Chorin has failed to demonstrate what additional evidence Mr. Henry would have offered at trial that would have been helpful to his defense, even if Busico was deficient for failing to further investigate Mr. Henry, Chorin has not demonstrated that he was

23

prejudiced by the outcome of that alleged failure.  Accordingly, Chorin has failed to satisfy either requirement under Strickland and he is not entitled to relief on this claim.

### Engasser/DeSumma

Chorin also argues that Busico was ineffective for failing to investigate and subpoena Robert Engasser and Frank DeSumma, cell mates of government witnesses Edmond Gifford and Manfred DeRewal.  Chorin argues that they would have offered significant testimony that would have impeached the testimony of both government witnesses.  Chorin states that Engasser would have testified about Gifford's penchant for testifying against other prisoners in exchange for a reduced sentence and that DeSumma would have testified that Chorin never told DeRewal about any illegal activity, but instead that DeSumma learned about the facts of Chorin's case by surreptitiously rifling through case pleadings that Chorin left unattended.  (Doc. 183 at 5).

In his motion, Chorin states that Busico offered no explanation at the 2255 hearing why he did not investigate these witnesses.  However, Busico was never asked about either witness at the hearing.  Nevertheless, our review of the record demonstrates that Busico did employ a reasonable strategy to impeach the testimony of Gifford and DeRewal.  On cross-examination, Busico challenged their credibility by presenting

24

evidence of their <u>lengthy</u> criminal histories, including convictions for various drug-related offenses.  (N.T. 12/2/99 at 15-49, 52-56; N.T. 12/1/99 at 77-82).  While Engasser and DeSumma may have shed additional light on the histories of these witnesses, there can be no doubt that the prosecution would have then attacked the reliability of their testimony by introducing evidence of their own criminal pasts - including Engasser's murder conviction.

     Busico also established during his cross-examinations of Gifford and DeRewal that they stood to receive reduced sentences by cooperating in this case, and that Gifford, in particular, had received sentence reductions for cooperating in the past.  (N.T. 12/1/99 at 73; N.T. 12/2/99 at 36-8, 41-2).  Busico further got DeRewal to admit that he had reviewed the pleadings in Chorin's case before he contacted the government to discuss his potential cooperation.  (N.T. 12/1/99 at 81-2.)

     In light of the risk involved with calling the additional witnesses that Chorin has identified to testify, and the fact that Busico effectively impeached Gifford's and DeRewal's testimony using their own criminal records, we find that Busico's strategy was reasonable.  Thus, Chorin has failed to carry his burden of overcoming the presumption of constitutionally acceptable performance with regard to this claim.

**Patty Mallon**

Lastly, Chorin alleges that Busico should have subpoenaed Patty Mallon, Chorin's former acquaintance, to testify at trial. Chorin claims that Ms. Mallon's testimony would have proven his whereabouts during the period when Count One (attempt) was alleged to have occurred (August 1998). Chorin argues that Ms. Mallon would have testified that he was not in Philadelphia at that time and instead was staying with her at her home in Wildwood, New Jersey. Chorin also states that Ms. Mallon would have testified that Chorin had no assets during that time and remained in her presence almost continually.

The Court fails to see how this testimony would have had assisted Chorin in his defense of Count One. The prosecution did not allege that Chorin was present at the time of the search on Hortter Street. The fact that he may have resided with Ms. Mallon in New Jersey during that period is not compelling. Furthermore, Mr. Busico testified at the 2255 hearing that he had considered subpoenaing Ms. Mallon to testify, but that based upon the information that Chorin provided to him about Ms. Mallon, calling her to testify may have been too damaging to the defense. Ms. Mallon knew about Chorin's extensive knowledge about the methamphetamine manufacturing business. Busico believed that allowing her to testify would have opened the door for the prosecution to ask her about those details, further damaging

26

Chorin's character.  (N.T. 3/18/05 at 20).  The Court does not
find that Mr. Busico strategic decision not to call Ms. Mallon
was unreasonable and Chorin is not entitled to relief on this
claim.

**Failure to Object to Jury Instruction on Attempt**

        Chorin alleges that Busico's failure to object to a
statement made by the Court during its jury instructions
prejudiced the outcome of his trial.[7]  While instructing the
members of the jury as to Count One (attempt to manufacture
methamphetamine), the Court stated: "Obviously this is an attempt
to manufacture methamphetamine.  I will define attempt for you."
(N.T. 12/3/99 at 27).  Chorin argues that the portion of the
statement "Obviously this is an attempt to manufacture
methamphetamine" was "a highly prejudicial comment that it
sounded like a conclusion by the trial judge, at worst, and was
confusing to the jury at best." (Doc. 183 at 26).

_____

        [7]Chorin also claims that Busico's performance was deficient
for failing to file pre-trial and post-trial motions on his
behalf.  However, he fails to inform the court regarding the
precise motions that Busico should have filed and how his failure
to file those motions harmed him.  A review of the record shows
that Busico did, in fact, file a pre-trial motion to suppress
evidence.  Busico withdrew as counsel prior to sentencing.
Without explaining to the Court the substantive arguments that
his attorney should have pursued on his behalf or how they would
impacted his case, we are unable to find that Busico's failure to
file certain pre-trial and post-trial motions was unreasonable.

Upon review of the record, we do not believe that the statement was conclusory or confusing.  The statement was made in order to clarify that Chorin was charged with an attempted manufacturing of methamphetamine, not a completed one.  Later, in the instruction as to this count, we informed the jury that in order to convict Chorin, the charge had to have been proven *beyond a reasonable doubt*.  (N.T. 12/2/99 at 33).  Therefore, even if in isolation the statement appeared conclusory and/or confusing, the Court later clarified the legal standard in order to convict.  Accordingly, we do not find that trial counsel was deficient for failing to object to what was a reasonable statement when read in context.

**Sentencing Counsel**

Chorin retained Arthur S. Shuman to represent him at his April 27, 2001 sentencing.  Chorin now alleges that Shuman rendered ineffective assistance of counsel during the post-trial period and at sentencing, thereby prejudicing him.

Chorin alleges that Shuman was deficient for two reasons: 1) failing to retain and call an expert chemist as a witness at sentencing; and 2) failing to raise a material Brady violation which became apparent after trial, but before sentencing.

We have already determined that Chorin's claim that trial

counsel was deficient for failing to hire an expert is without merit.  We conclude the same with regard to his claim that sentencing counsel was deficient for failing to hire an expert to testify at sentencing.

Chorin primarily argues that the testimony of a defense expert would have disputed the government's theoretical yield of the drug quantity. (Doc. 183 at 36).  As previously mentioned, Gene Geitzen's report does not address any matters at the Hortter Street location.  At trial, the government's expert testified that, based upon the amount of methylamine seized at both locations, 73.2 kilograms of pure methamphetamine could have been produced.  The Court credited that testimony.

Shuman testified at the 2255 hearing that he had consulted with an analytical chemist, one that he had retained in previous cases, in preparation for sentencing.  (N.T. 3/18/05 at 59-60).  Based upon his discussion with that expert, he decided not to retain him because his calculation of the amount of methamphetamine that could have been produced based upon the items seized at both locations significantly exceeded the amount that the government was required to estimate in order to prove the offense.[8]  Id.  Shuman's decision to proceed at sentencing

_____

[8]Only three kilograms of pure methamphetamine were required to place Chorin at base level 38.  U.S.S.G § 2D1.1 (c).  The DEA expert testified that 70.2 kilograms of pure methamphetamine could have been manufactured based upon evidence seized at both

29

without an expert was reasonable in light of his inability to contradict the conclusions of the DEA chemist, Charles Cusumano. Shuman did, however, call Mr. Cusumano as a witness at sentencing, questioning the accuracy of his analysis.  (N.T. 9/7/01 at 46-68).

Shuman took the necessary steps to investigate the appropriateness of an expert at sentencing.  His decision not to retain an expert when it became clear that such testimony would not advance Chorin's position was an acceptable decision made within the parameters of reasonable professional judgment.

The Court now turns to Chorin's second claim of ineffectiveness based on sentencing counsel's failure to raise a Brady violation to the Court.  In order to reach the merits of the ineffectiveness claim, the Court must first examine whether an actual Brady violation occurred.

The government is required to disclose material exculpatory evidence to a defendant under Brady v. Maryland, 373 U.S. 83 (1963).  A new trial is warranted when there is a reasonable probability that disclosure of undisclosed evidence would have altered the outcome of the case.  United States v. Bagley, 473 U.S. 667 (1985); Government of Virgin Islands v. Martinez, 780 F.2d 302, 306 (3d Cir. 1985).  In addition, when

---

locations.

there is a factual issue regarding whether a <u>Brady</u> violation occurred and such claims are not frivolous or palpably incredible, a defendant is entitled to a hearing by the court. <u>Martinez</u>, 780 F.2d at 306 (citing <u>United States v. Alexander</u>, 748 F.2d 185, 193 (4th Cir. 1984); <u>United States v. Dansker</u>, 565 F.2d 1262 (3d Cir. 1977), cert. dismissed, 434 U.S. 1052 (1978)).

The Supreme Court extended the <u>Brady</u> rule when it decided <u>Giglio v. United States</u>, 405 U.S. 150 (1972), requiring the Government to also disclose impeachment materials to the defense. Under <u>Giglio</u>, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" justifies a new trial irrespective of the good faith or bad faith of the prosecution. <u>Giglio</u>, 405 U.S. at 153-4. The evidence must be material and "[a] new trial is required if the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ..." <u>Id</u>. at 154.

Chorin states in his Motion that he obtained "through a fellow inmate at F.C.I. Schuylkill after his trial, discovery which proved that Gifford had in fact sold substantial quantities of methamphetamine in 1997, that at least one of these attempted sales had been audio and videotaped by the D.E.A., and that Special Agent Woodcock was personally involved in Gifford's 1997

arrest." (Doc. 183 at 37).[9]  Chorin claims that the government
violated his constitutional rights by failing to disclose
evidence that Gifford had previously sold methamphetamine, which
Gifford denied doing when cross-examined at trial.  (N.T. 12/2/98
at 18).  Although Chorin shared this information with Shuman
prior to sentencing, Shuman did not raise the issue to the Court.

First, we will evaluate whether the non-disclosure of
Gifford's record constituted a Brady violation.  Gifford plead
guilty, and was subsequently sentenced in December 1998 to, among
other things, distribution of methamphetamine.  The indictment in
that case was unsealed on August 20, 1998 and therefore a matter
of public record at the time of Chorin's trial.  Paragraph 26 of
the Indictment against Gifford and his co-defendants states, in
relevant part: "On or about February 24, 1998, defendant Edmond
Gifford sold and distributed approximately two (2) pounds of
methamphetamine to a person known to the grand jury in return for
partial payment of $10,000."

Brady does not obligate the government to disclose
information that is discoverable by the defense.  See Fullwood v.

---

[9]The discovery consists primarily of a D.E.A. 6
investigation report, which Chorin has attached as an exhibit to
the instant motion. (Doc. 183 at 37).  Our review of the report
indicates that the sale in which Gifford was involved occurred in
February 1998, not in 1997, as Chorin states.

<u>Lee</u>, 290 F.3d 663, 686 (4th Cir. 2002).[10]  Consequently, we do not agree that the government violated the standards set forth under <u>Brady</u> and <u>Giglio</u> by not disclosing this information to the defense.

Furthermore, even assuming arguendo that the government was obligated to provide the defense with that information, the outcome of Chorin's trial was not compromised by its non-disclosure.  Chorin's trial counsel cross-examined Mr. Gifford at length about his substantial criminal history, including his prior convictions for manufacturing methamphetamine and importing P2P in the 1980s (N.T. 12/2/99 at 16-18).  Gifford also admitted that he became involved in the drug business again in 1997 where he engaged in, among other things, manufacturing and distributing methamphetamine.  <u>Id</u>. at 27-30.  This activity lead to his arrest in March 1998 and subsequent conviction on federal charges.  <u>Id</u>.  Given the amount of information that counsel utilized to impeach Gifford's testimony, we do not agree that the jury's consideration of this additional fact would have impacted their assessment of Gifford's credibility.

Accordingly, because we have not found that the

_____

[10]Even though Agent Woodcock was one of the DEA agents involved in Gifford's case, it is unclear whether he was aware that Gifford had committed perjury.  Gifford's case was a complex involved multiple defendants who engaged in multiple transactions.  It is entirely possible that Agent Woodcock did not recall the specific event.

government committed a material Brady violation upon which
Chorin was entitled to relief, we do not agree that Shuman was
deficient for failing to raise the issue.  See Werts v. Vaughn,
228 F.3d 178, 203 (3d Cir. 2000) (counsel cannot be deemed
ineffective for failing to raise a meritless claim).


**Appellate Counsel**

Lastly, Chorin asserts that he received ineffective
assistance of counsel on direct appeal.  The Strickland test
applies with equal force to the evaluation of appellate counsel.
Mannino, 212 F.3d at 840 n.4 (citing Diggs, 833 F.2d at 444-
445).  In order to demonstrate that appellate counsel was
deficient, a petitioner must do more than show that counsel
failed to raise every non-frivolous issue, for an appellate
counsel is under no obligation to raise all issues, but may pick
and choose so as to maximize the chances of a successful appeal.
Smith v. Robbins, 528 U.S. 259, 288 (2000) (citing Jones v.
Barnes, 463 U.S. 745 (1983)).  "Generally, only when ignored
issues are clearly stronger than those presented, will the
presumption of effective assistance of counsel be overcome."
Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986) (quoted in
Smith, 528 U.S. at 288).

Chorin makes no showing that the claims he now raises
are stronger than those that were raised in his direct appeal.

Shuman again represented Chorin on appeal.  Chorin argues that Shuman's representation at that phase was deficient because he: 1) improperly raised an Apprendi[11] issue; 2) failed to argue a meritorious sentencing issue which he had previously raised before the District Court; 3) failed to raise the issue of the Court's erroneous jury instruction regarding the charge of attempt to manufacture methamphetamine; and 4) raised frivolous claims on appeal while failing to raise other meritorious claims.

Chorin's first argues that Shuman improperly raised an Apprendi violation on direct appeal because the Third Circuit had already issued United States v. Vazquez, 271 F.3d 93 (3d Cir. 2001), thus rendering the argument frivolous.  Chorin essentially argued in his direct appeal that the sentence he received violated the holding in Apprendi by imposing consecutive sentences as to Counts One and Three pursuant to U.S.S.G § 5G1.2(d).  The Third Circuit rejected that argument, stating that "Apprendi addresses the unconstitutional practice of a sentencing judge imposing a sentence that exceeds the statutory maximum sentence authorized by the jury based on facts that were not submitted to a jury and proved beyond a reasonable doubt...It does not address the sentencing procedure used pursuant to the Sentencing Guidelines to reach a sentence,

---

[11]Apprendi v. New Jersey, 530 U.S. 466 (2000).

provided that the resulting sentence does not exceed the statutory maximum sentence authorized by the jury verdict." Chorin, 322 F.3d at 278.

Chorin's argues that the Apprendi claim that Shuman raised on appeal was frivolous because the Third Circuit had already decided Vazquez.  We find that argument unpersuasive. In Vazquez, the Third Circuit determined that the district court committed an Apprendi violation because it increased a defendant's sentence beyond the prescribed statutory minimum based on it own factual finding of the drug quantity instead of submitting the issue to the jury for its determination. Vazquez, 271 F.3d at 99.

Despite Chorin's representation, a review of the appeal shows that Shuman did not challenge Chorin's sentence on those grounds.  Instead, as previously stated, he argued that this Court's imposition of a consecutive sentence on Counts One and Three violated Apprendi because the total sentence exceeded the statutory maximum authorized under Count One.  Notably, the Third Circuit did not reference the Vazquez decision in its evaluation of Chorin's claim.  Instead, the Court determined that Apprendi ignores the issue of consecutive sentencing, concerning itself only with whether a sentencing court has exceeded the statutory maximum sentence authorized for a particular count.  Chorin, 322 F.3d at 279.

Indeed, the alleged Apprendi violation that Chorin raised on appeal was rejected.  However, we do not agree that the claim was frivolous.  At the time Chorin filed his appeal, a host of issues were left unresolved by Apprendi.  The treatment that the claim was given by the Third Circuit suggests that the claim, despite its flaws, was not entirely frivolous and certainly worthy of preserving on appeal given the uncertainty in the law at the time regarding Apprendi.

Chorin also argues that appellate counsel was ineffective for failing to raise the issue of an erroneous jury instruction on direct appeal.  As we explained earlier, the Court's statement: "Obviously, this was an attempt to manufacture methamphetamine", when reviewed in context, shows that it mas merely an attempt to inform the jury that the charge was an attempt to manufacture methamphetamine, not a completed manufacturing.  Immediately following the statement, the Court stated "I will define attempt for you" and the elements of the offense were provided.  (N.T. 12/3/99 at 27).  The Court then explicitly instructed the jury that the charge had to have been proven beyond a reasonable doubt in order to find Chorin guilty of attempt.  Id. at 33.

Because Shuman was not asked about this issue at the 2255 hearing, it is unclear how he interpreted the instruction. It is entirely possible that he interpreted it as we do.

37

However, even if Shuman interpreted the comment as Chorin has, and failed to raise it on appeal, we do not believe that it would have been a successful claim.  The members of the jury were clearly instructed as to the appropriate legal standard and we are confident that the verdict was in no way undermined.[12]

Chorin also argues that Shuman should have raised on appeal an earlier argument that he raised at sentencing requesting a downward departure from Chorin's base level offense.  Chorin asserts that because Shuman previously argued Chorin's eligibility for a reduction from base level 38 to 34 based upon U.S.S.G. § 2X1.1, he should have again raised that issue on direct appeal.  Section 2X1.1 of the 2001 Federal Sentencing Guidelines, entitled "Attempt, Solicitation or Conspiracy" allows a reduction of three levels for attempt "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond defendant's control."

Based on the substantial quantity of methylamine seized

---

[12]Chorin also argues that Shuman should have raised on appeal that it was plain error not to request a jury instruction to "consider the testimony of a jailhouse informant who stands to benefit from testifying..."  A review of the record shows that the Court clearly instructed the jury as to this point.  See N.T. 12/3/99 at 12-13.

from both locations and the fact that P2P and a small amount of methamphetamine were additionally found at the Hortter Street location, denial of a downward departure pursuant to this section of the Guidelines was reasonable.  Our conclusion that Chorin would have engaged in the manufacturing of methamphetamine, but for his apprehension, was reasonable upon consideration of the facts.  Shuman was not asked about this issue at the 2255 hearing.  However, in light of the prior determination by this Court and the nature of the items seized during the DEA searches, it was not unreasonable that appellate counsel chose not to further pursue this claim on appeal.

_____Chorin has not demonstrated that any of the claims that he asserts *should* have been raised on direct appeal are any stronger than the ones that were raised.[13]  Prejudice is evident at the appellate phase if one demonstrates a likelihood of success on appeal had these alternative issues been raised. Mannino, 212 F. 3d at 845.  For the foregoing reasons, appellate counsel's representation on appeal was not deficient, falling within the parameters of reasonable professional representation.

---

[13]Chorin argues that Shuman should have raised on direct appeal the Brady violation discussed earlier instead of a different Brady violation that the appellate court determined lacked merit.  For the reasons already set forth, the Brady violation that Chorin has raised in the instant motion also lacks merit.  Thus, we do not agree that this new claim is sufficiently stronger than those raised on appeal and Chorin has not overcome the presumption of effective assistance of counsel.  See Gray, 800 F.2d at 646.

## IV. Conclusion

The Court concludes Chorin's claims of ineffective assistance of counsel fail to meet the standards established under <u>Strickland</u> and its progeny.  Thus, Chorin is not entitled to a new trial or to have the jury verdict set aside or his sentence corrected.  An order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
United States of America          :        CIVIL ACTION
                                  :
                                  :        04-cv-2531
                                  :        98-cr-450-2
             v.                   :
                                  :
David Chorin                      :
```

<u>ORDER</u>

_____AND NOW, this   14th   day of February 2008, upon consideration of Defendant's motion pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence and all responses thereto, it is hereby **ORDERED**:

1.    The Defendant's motion is **DENIED;**

2.    The Defendant's request to reopen the record to allow the testimony of Patty Mallon is **DENIED;**

3.    The Defendant's request to reopen the record to allow the testimony of Arthur R. Shuman, Esquire is **DENIED;**

4.    The Court finds there are no grounds to issue a certificate of appealability.

BY THE COURT:

s/J. Curtis Joyner
J. CURTIS JOYNER, J.